## THE REGULUS.

*(District Court, S. D. New York.   November 5, 1883.)*

1. SHIPPING—SEAWORTHINESS.
    A ship must be fit and competent for the kind of cargo and particular service for which she has engaged.

2. SAME—CHARTER—OVERLOADING FRUIT CARGO.
    Where a vessel was chartered to take oranges from Valencia to New York, agreeing that "the hatches should be taken off whenever practicable, as usual, for the ventilation of green fruits," *held*, that it was a violation of the terms of the charter for the vessel to load so deeply with previous cargo that she was unable to provide for the usual ventilation necessary for such fruit, and that loading so as to leave from one to three feet less free-board than usual was evidence of such overloading.

3. SAME—VENTILATION—PROXIMATE CAUSE OF LOSS
    Where, in consequence of such overloading, the vessel was subjected to taking in more water on deck, so that the hatches had to be kept closed more than usual, and the fruit was thereby deteriorated from want of ventilation, *held*, that the overloading was the proximate cause of the loss, for which the ship was liable.

In Admiralty.

*Wm. A. Walker* and *Geo. A. Black*, for libelant.

*W. W. Goodrich*, for claimants.

BROWN, J.   This action was brought to recover damages for injury to 4,336 cases of oranges, shipped in good condition at Valencia, Spain, on board the Regulus, about the seventh of January, 1881, and delivered in a greatly damaged condition on arriving at New York, on the ninth of February following.

In November previous the libelant had chartered the Regulus, after loading with mineral at Elba at captain's option, for the owner's benefit, say from 1,250 to 1,800 tons, to proceed to Valencia, and to load for the libelant 4,400 cases of oranges, or other fruit, to be transported to New York   The charter contained the usual provisions that the ship should be "every way *fitted for the voyage*, * * * and that the hatches should be taken off whenever practicable, as usual for ventilation of green fruit."   At Elba the ship took on board 1,200 tons of ore; arrived at Valencia on the fifth, there received 4,326 cases of fruit, left Valencia on the evening of the seventh, arrived at Gibraltar on the evening of the ninth, where she took on board 300 tons of coal, left Gibraltar on the tenth, and arrived in New York on the ninth, of February.

The voyage was about a week longer than is usual, even at that season.   The weather became very heavy and tempestuous immediately after leaving Gibraltar.   I find from the evidence that the cargo was properly stowed; that the ship was not overloaded, having reference to her ability to cross the Atlantic safely; and that suitable means for ventilation were adopted before leaving Valencia, with the usual arrangement of booby hatches and ventilators.   These hatches and ventilators, however, were swept away during the first

four days after leaving Gibraltar. They were replaced in a day or two, and again swept away by heavy seas. Tarpaulins were then put on the hatches, and such other appliances were used for ventilation as could well be adopted during the heavy weather; and with the ship deeply loaded as she was, and the tempestuous weather, I do not find any actual negligence after leaving Gibraltar in the endeavors to afford suitable ventilation for the fruit.

The real cause of the damage of the fruit was, nevertheless, the want of sufficient ventilation, combined with the length of the voyage; and the evidence on each side satisfies me that both these causes arose from the overloading of the steam-ship for the carriage of fruit. The Regulus was of 914 tons register, and when she left Gibraltar she had nearly 1,900 tons aboard, including coal,—almost her utmost capacity. That the vessel was too deeply loaded for the carriage of fruit, and for the proper ventilation of a fruit cargo, appears distinctly, even from some of the claimants' witnesses. The surveyor called by them testified that four feet nine inches free-board was the outside limit of safety of the Regulus for any cargo, for any time of year, and for any part of the world, while the Regulus sailed with but four feet four inches free-board. The stevedore called by them, who had had very large experience in the discharge of fruit vessels, testified that the Regulus was loaded a foot deeper than other fruit vessels which he had known; while the evidence on the part of the libelant shows that fruit vessels usually sail somewhat light, and require from two to three feet more free-board than ordinary cargoes, in order to permit the hatches to be off without danger from water, for the purposes of ventilation and to prevent heating. The washing off of the booby hatches, and the quantity of water taken on board the Regulus on her voyage, required the hatches to be kept closed so much as to render the necessary ventilation impossible. Had she been loaded in the manner usual and fit for the carriage of fruit cargoes, any such result from tempestuous weather might properly have been set down to the dangers of the sea. But this defense cannot be allowed where the vessel is deliberately overloaded, as respects the particular kind of cargo taken aboard, and the known necessity of frequent ventilation with open hatches. That one or two feet more free-board would have caused less water to be taken aboard is not only evident in itself, but it is directly admitted by several of the claimants' witnesses. The Navigator left Gibraltar the same day as the Regulus, with seven feet free-board, and brought her cargo into Boston unharmed. The overloading of the Regulus also materially prolonged the voyage, and in that way further contributed to the injury of the fruit. The Ross End Castle, loaded with fruit, left Gibraltar three days later than the Regulus, and arrived in New York four days earlier, without injury to her cargo or difficulty in giving suitable ventilation; and the captain of the Regulus states that he slowed his speed in consequence of so much water being shipped aboard.

The right reserved in the charter to load from 1,250 to 1,800 tons of mineral did not relieve the vessel from her obligation to transport the fruit with the usual facilities for ventilation, or permit her to load so deeply as to interfere with the usual ventilation in the rough weather to be expected at that season of the year.

The bill of lading in this case contains a clause excepting liability "for negligence of the master or crew," and provides that the ship shall not be liable for any damages arising therefrom. This charter having been made in London, and the English law admitting the validity of such express stipulations, (*The Duero,* L. R. 2 Adm. & Ecc. 393; *P. & O. Steam Nav. Co.* v. *Shand,* 3 Moore, P. C. (N. S.) 272; *Steel* v. *State Line Co.* 3 App. Cas. 72, 89,) it is urged that the law of the place of contract must prevail; and on this ground the claimants contend that the ship cannot be held for this damage. But if the view above taken of the cause of the injury to the oranges be correct, it is not the case of mere negligence of the master, but of violation of the express and implied covenants of the charter. Not only by the general maritime law must the ship be fit and competent for the sort of cargo, and the particular service for which she is engaged, (3 Kent, Comm. *205; Macl. Shipp. 406,) but such is the express contract of this charter, and that the "hatches should be taken off whenever practicable, *as usual for ventilation of green fruits.*" It is not a compliance with this provision of the contract to load the vessel with previous cargo deeper than usual for fruit cargoes, and when in rough weather the hatches are required to be kept on more than is fit or usual for fruit cargoes in consequence of the deep loading, to say that the hatches were opened when practicable under such circumstances. The agreement for ventilation, "as usual for green fruits," binds the vessel to load no deeper than usual, and so as not to impair the usual facilities for ventilation. I regard the overloading in this case, therefore, as a violation of the terms of the charter, for which the vessel is answerable without reference to any question of negligence.

Being chargeable with this violation of the terms of the charter in loading deeper than was usual for cargoes of green fruit, the claimants cannot be permitted to speculate upon the probabilities of equal injury being suffered through the extraordinary weather if the vessel had been loaded to only the usual depth. The overloading manifestly tended directly to increase the danger of washing off the hatches, and contributed to the constant accumulation of water on deck, and the consequent more restricted ventilation and the longer voyage. The overloading must therefore be deemed to be the proximate cause of the loss, for which the vessel is answerable. *Clark* v. *Barnwell,* 12 How. 280.

The libelant is not shown to have been guilty of any laches. When the fruit was shipped by him he was not aware of the large amount of coal which was to be taken on board subsequently at Gibraltar;

and when his misgivings in regard to the loading were stated to the captain, the latter assured him of the vessel's ability to carry the fruit safely.

The libelant is entitled to judgment, with costs, and a reference may be taken to compute the damages.